NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190851

NO. 4-19-0851

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 8, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| MISOOK NOWLIN, | ) | No. 11CF800 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Casey Costigan, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Cavanagh and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The circuit court did not err in finding defendant failed to make a substantial showing the State knowingly presented the perjured testimony of a witness.

(2) Defendant was denied a reasonable level of representation during proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)).

¶ 2    Defendant, Misook Nowlin, appeals the circuit court's dismissal of her postconviction petition without an evidentiary hearing. On appeal, defendant argues (1) the circuit court erroneously dismissed her petition as she made a substantial showing the State knowingly presented the perjured testimony of a witness, Tonya Bean, during defendant's trial; and (2) she was denied the reasonable assistance of postconviction counsel as counsel failed to properly present her perjury claim and obtain an affidavit from a witness for the claim added by

appointed counsel. We agree with defendant's latter claim of error and reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4          In September 2011, defendant was charged with three counts of first degree murder of her mother-in-law, Wenlan Linda Tyda, (720 ILCS 5/9-1(a)(1), (a)(2) (West 2010)) and one count of concealment of homicidal death (720 ILCS 5/9-3.4(a) (West 2010)). The State alleged on or about September 5, 2011, defendant knowingly and without lawful justification killed Wenlan, a person over 60 years of age, by applying pressure to her neck and then knowingly concealed her death with knowledge Wenlan died by homicidal means.

¶ 5                                  A. Defendant's Trial

¶ 6          At the start of defendant's December 2012 jury trial, defendant pleaded guilty to the concealment charge. The trial continued on the first degree murder charges.

¶ 7          Defendant's jury trial proceeded over multiple days in December 2012. The evidence establishes defendant, in 2011, lived in Bloomington, Illinois, with her husband, Don Wang, and their young son, D.W. Defendant owned a sewing shop, Kim's Sewing, in Bloomington. Wenlan resided in Crest Hill, Illinois, located in Will County. Wenlan was 70 years old and self-employed "in freelance translation."

¶ 8          The State's theory of the case was defendant killed Wenlan for the money. Defendant and Wang had been married approximately 13 years. In 2011, defendant suspected Wang was having an affair with Jenny Chen, who worked for Wenlan and was very close to Wenlan. As part of her business, Wenlan would often travel. On September 4, 2011, Wenlan received a phone call. The individual on the line spoke Mandarin and asked Wenlan to meet her at 5:30 a.m. at the Cub Foods' parking lot, as she needed a ride to Chinatown in Chicago. The woman offered Wenlan $500. That same day, Wenlan drove Wang to the airport, as he was

flying to California to renew his driver's license. Wenlan told Wang about the meeting. After Wenlan did not return home that day, her husband contacted the Crest Hill police. Bloomington police officers began contacting individuals Wenlan knew in Bloomington, including defendant. Testimony establishes defendant went to Hibachi Grill, asking for someone who spoke Mandarin to make a phone call for her. Defendant gave $20 to the woman who made the call for her.

¶ 9        In the investigation of Wenlan's disappearance, police officers learned defendant drove Wenlan's car to Chicago and parked it near Midway Airport. They also learned defendant took a Peoria Charter bus to Normal, Illinois, and a cab to her business. Officers further discovered defendant purchased, around 10 a.m. on September 6, 2011, a 50-gallon tub. After 6 p.m., defendant returned to Lowe's and purchased a shovel and furniture sliders.

¶ 10        When talking to the police, defendant denied the phone call and going to Hibachi Grill. Injuries were observed on defendant's arms, legs, and chest. Defendant said her son scratched her and she had fallen at work.

¶ 11        After being taken into custody, defendant wrote a letter to her adult daughter, Michelle Nowlin. Defendant admitted in that letter luring Wenlan to Bloomington but she did so to try to get Wenlan on her side to repair her marriage. Defendant wrote she knew Wenlan was angry with her and would not talk to her if she made the call herself. Defendant further told Michelle that Wenlan followed her from Cub Foods to the shop, where they fought and struggled outside until defendant grabbed Wenlan by her neck and choked her until she stopped. Defendant said she attempted to resuscitate Wenlan but could not. Then, defendant reported dragging Wenlan into the shop and keeping her there for a day or so.

¶ 12        Wenlan's husband, Larry Tyda, testified to a conversation he overheard between defendant and Wenlan days before Wenlan's disappearance. Defendant and Wenlan were

- 3 -

arguing on the phone. While they were arguing, the doorbell rang. Defendant was standing outside the house. She wanted to talk to Wenlan. Wenlan told her husband she was afraid of defendant. Defendant left after Larry threatened to call the police.

¶ 13 Wenlan's body was found on September 12, 2011, off Interstate 55, exit 241, in a shallow grave. The clothes from Wenlan had been removed, her identification removed, and she was buried in two black garbage bags. The cause of death was strangulation. The coroner testified manual strangulation usually causes a person to lose consciousness within 10 to 15 seconds and causes death in three to six minutes.

¶ 14 During defendant's jury trial, the State called Tonya Bean to testify. At the beginning of her testimony, Bean admitted having been convicted, in 2008, of felony driving while her license was revoked. In December 2011, Bean was incarcerated in McLean County jail on a charge of aggravated battery with a deadly weapon. Another case for aggravated battery was also pending at that time. During her time in jail, Bean interacted with other inmates, including defendant. Bean met defendant during the two and a half months they were incarcerated. Bean had not met defendant before that time. Bean and defendant were in the same pod, a common area for inmates.

¶ 15 Bean testified defendant told her about the events of September 4, 2011. On September 4, defendant talked to an employee at Imperial Buffet. Defendant told Bean she went to "Imperial Garden" because she was very upset with her husband. Defendant wanted to go there to get him fired. When defendant went to the restaurant, she spoke with a woman who worked there and offered her $20 to call her mother-in-law, pretend she needed an interpreter, and tell her to meet her at Cub Foods in Bloomington at 5:30 a.m. the next day. Defendant told Bean she wanted to meet Wenlan at Cub Foods "to pretty much confront her about things, about

what was going on with her and her husband's marriage." Defendant said her husband was cheating and he would be in California on September 5, 2011. Defendant worried they would get divorced.

¶ 16 According to Bean, defendant said she took $10,000 from a joint account she shared with Wang and Wenlan. Defendant did so because she was afraid Wang would leave her and she would have no money. Defendant met Wenlan at Cub Foods at 5:30 a.m. on September 5, 2011. The two argued because "it was kind of like a set up." Defendant told Wenlan she had two checks for her but did not want to argue at Cub Foods. The two went across the street to defendant's business. When the two exited their vehicles, they argued about the marriage again and "the situation of Jenny." Once inside defendant's business, "they got physical." Defendant told Bean the following about the strangulation: "[Defendant] started choking her mother-in-law and her mother-in-law started choking her back and *** her mother-in-law was trying to say something and she kind of let her loose and she said I just wish you and Don would get back together, you know, and be happy. And she just started choking her and killed her."

¶ 17 Defendant told Bean she got a plastic tub with a lid on it, put Wenlan's body in the tub, and placed the tub in the back of her store. While this was occurring, D.W. was sleeping in the back of defendant's car. The tub remained in defendant's store for about a day. It began to smell "like rotten eggs." Defendant called a friend to help move a tub "of dishes" into the back of defendant's car. Defendant then drove to Chicago to Chen's house to see if Wang and Chen were there. Defendant "had a rubber mallet and she said that she was going to knock them out." However, Wang and Chen were not there, and defendant began to panic. Defendant began driving back to Bloomington. She looked for a "dark exit," where she turned off and found a wooded area. Defendant had a shovel she bought from Lowe's and dug a hole. When defendant

removed the tub from her car, she fell and scraped her knees. Defendant buried Wenlan. Defendant confided Wenlan had a $250,000 life insurance policy and defendant believed, whether married or divorced, she would be entitled to some of the money.

¶ 18        Bean testified her conversation with defendant upset her. Bean returned to her cell and began to write down everything she could remember from her conversation with defendant. Bean then asked to speak to the police as soon as possible. On December 22 or 23, Bean met with Detective Barkes from the Bloomington Police Department. Bean told Detective Barkes about her conversation with defendant. Her notes were entered into evidence. The day after Bean's conversation with Detective Barkes, she attended a hearing to lower her bond on the charge of aggravated battery with a deadly weapon. The State did not object to her motion as a favor to her. Bean posted bond. Her case remained pending and was set for trial. On the day trial was to begin, the State dropped the charges due to an uncooperative victim, Bean's fiancé.

¶ 19        Defendant's theory of the case was that she was acting in self-defense and the asphyxiation was unintentional.

¶ 20        Testifying on her own behalf, defendant stated she and Wang married in 2003. D.W. was born in 2006. In May 2011, defendant learned of Wang's relationship with Chen. Defendant learned of phone conversations the two were having. The two talked 300 to 400 minutes every day. This started in 2010, she believed. Defendant was afraid of what would happen to her and D.W. should her marriage fall apart as she had only $200. The day after she learned of the affair, she went to the bank and withdrew all the money from the joint bank account she shared with Wenlan and Wang. The two decided to stay together, but approximately a month later, defendant learned from a hostess at Imperial Buffet, where Wang worked, that Wang and Chen continued to have a relationship.

¶ 21    According to defendant, she met with Wang's boss, Raymond Poon, who was good friends with Wenlan and Wang. Defendant told Poon of her marital problems and Wang's cheating. She also told him she wanted $50,000, child support, and alimony as part of a divorce settlement. Defendant told Poon she did not want defendant working at Imperial Buffet as Wang had been stealing money from the restaurant and receiving an unemployment check from California. Defendant was hoping if Wang lost his job, they would return to California together.

¶ 22    Defendant testified Wenlan called about Wang losing his job. Wenlan was very angry. Defendant denied Wang had been fired. Poon had told him to take care of his marriage and then return to work. Defendant attempted to call Wenlan multiple times but Wenlan refused to talk to her. Defendant attempted to visit her at her home. When Wenlan answered defendant's calls, Wenlan would not listen. She yelled and screamed at defendant.

¶ 23    Defendant explained she went to Hibachi Grill to find someone to call Wenlan because Wenlan, who was "so mad," would not talk to defendant. When Wenlan arrived at Cub Foods, she was surprised to see defendant and upset she had been tricked. Defendant told Wenlan she wanted to go to Chicago with D.W. and Wenlan and they could talk about "things." Defendant wanted Wenlan's help. Wenlan remained angry. Wenlan left Cub Foods first. Defendant returned to her shop so D.W. could sleep on the futon. While there, defendant was happy to see Wenlan pull into the parking lot. Defendant was hopeful Wenlan was there to help her. Defendant went to Wenlan's car and attempted to hug her. Wenlan pushed defendant and pushed her again. When defendant fell, Wenlan picked up defendant's shoes and began striking defendant in the head with them. The two fought in the parking lot. Wenlan was wearing "a big sweater" and had a pocketbook. After Wenlan held onto defendant's leg, defendant held very tightly to Wenlan. She twisted her clothing. Wenlan started to choke defendant. At one point,

defendant was on top of Wenlan. Wenlan stopped fighting. Defendant believed Wenlan passed out. Defendant did not know Wenlan had died.

¶ 24    According to defendant, she attempted to resuscitate Wenlan. Defendant did not call 911 because she could not believe what had happened and she was scared.

¶ 25    The jury found defendant guilty of first degree murder. The trial court sentenced defendant to consecutive prison terms of 50 years for first degree murder and 5 years for concealment. Defendant pursued direct appeals of both convictions. Regarding her first degree murder conviction, defendant argued she was entitled to a new trial as the trial court "allowed the prestige of the State's Attorney's office to artificially enhance Detective Barkes's credibility as a witness" by allowing him to sit at the State's table during trial. *People v. Nowlin*, 2015 IL App (4th) 130387-U, ¶¶ 3, 17. We affirmed defendant's murder conviction. *Id.* ¶ 37. Regarding the concealment conviction, defendant argued her guilty plea must be vacated due to the trial court's failure to admonish her sentences would run consecutively. *People v. Nowlin*, 2017 IL App (4th) 150957-U, ¶ 2. Because defendant did not file a motion to withdraw her guilty plea, we lacked jurisdiction to consider defendant's claim. *Id.* ¶ 15.

¶ 26                    B. *Pro Se* Postconviction Petition

¶ 27    In September 2015, defendant filed a *pro se* petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2014)), asserting multiple claims. Among the claims in her petition were allegations she was denied the effective assistance of counsel as counsel failed to present photographs of her injuries during trial and advised her improperly of the sentencing ranges for her alleged crimes. Defendant further asserted she was denied due process when the trial court denied her request for an interpreter, her husband testified falsely, and "the State knowingly used the perjured testimony during her trial to secure a conviction."

For that last claim, defendant identified Bean as the witness who provided the perjured testimony. In support of the perjury claim, defendant attached an affidavit signed by Tonya Findley. The affidavit states the following, in part:

"I[,] Tonya Findley, being duly sworn under oath, do hereby depose and state that the following is true and correct to the best of my knowledge:

1. The information contained herein[ ] is based upon my personal knowledge.

2. If sworn as a witness, I am competent to testify to the matters herein.

3. I have not been threatened, forced, or promised anything in exchange for providing this affidavit.

4. In 2011[,] I met [defendant] in Mc[L]ean County Jail, and she had bruises that were blue and dark purple around her neck[,] as if someone had tried to kill her.

5. I asked her what happened to her and she stated to me that she got into an argument with her mother-in-law, and that her mother[-]in[-]law started choking her.

6. I left Mc[L]ean County [on] October 6, 2011[,] and was in Chestnut [T]reatment Center.

7. In 2013, I returned to Mc[L]ean County Jail for a "dirty drop" and was mandated to do drug treatment.

8. While in Mc[L]ean County[,] I was living on the same

- 9 -

block with Tonya Bean who testified against [defendant].

9. I had heard rumors that Tonya testified against [defendant], so I asked Tonya what happened.

10. Tonya stated that she never liked [defendant,] so she contacted the [S]tate and asked if she gave them information against [defendant], would they drop her (Tonya's) charges.

11. Tonya Bean stated that she was told by the [S]tate that if she could provide them with any information against [defendant], she could go home.

12. Tonya Bean stated to me that [defendant] never told her that she wanted to kill or have a violent confrontation with her mother-in-law.

13. Tonya Bean stated to me that most of her testimony was information the states attorney [*sic*] told her to say.

14. Tonya Bean also stated that she got information about [defendant's] case from the news and having family/friends look up [defendant's] case via [the] internet.

15. I have specific knowledge and information, personal knowledge that Tonya Bean committed perjury when she testified against [defendant] and that the prosecutor knew she was not being truthful."

¶ 28   On November 30, 2015, the trial court advanced the petition to the second stage of postconviction proceedings and appointed counsel to represent defendant.

¶ 29                          C. Amended Postconviction Petition

¶ 30          On September 22, 2017, at a status hearing, counsel, Assistant Public Defender

Jeff Brown, informed the circuit court he had just been "reassigned this case last week." In

December 2017, Brown filed on defendant's behalf an amended postconviction petition. In this

amended petition, counsel presented two claims for postconviction review. In the first claim,

defendant argued her due process rights were violated when the State presented false testimony

by Bean that "could in any reasonable likelihood have affected the judgment of the jury." The

petition alleged, in part, Bean obtained information about defendant's case from the news and

family and friends, as well as from prosecutors in the case. Counsel attached to the amended

petition the Findley affidavit. In the second claim in the amended petition, a claim not relevant

here, defendant argued she was denied due process as she entered a guilty plea in exchange for

an agreed-upon sentence but received a more onerous sentence than agreed upon.

¶ 31          On January 24, 2018, Assistant Public Defender Ronald Lewis filed a motion

seeking to allow the McLean County Public Defender's Office to withdraw as defendant's

counsel. Lewis asserted he had been assigned the case. Lewis asserted the McLean County

Public Defendant's Office had a conflict of interest as a member of that office had defended

defendant at her trial and claims of ineffective assistance had been raised. The circuit court

denied the motion, finding no conflict of interest with the "contract attorneys" for the public

defender's office. Later, however, the circuit court allowed the public defender's office to

withdraw and appointed "an attorney from McLean County who is in private practice" to

represent defendant. On June 8, 2018, the circuit court appointed attorney Joshua Rinker as

counsel to represent defendant on her postconviction petition.

¶ 32                          D. Second Amended Postconviction Petition

¶ 33 On March 12, 2019, defendant, represented by Rinker, filed a second amended postconviction petition, asserting three arguments: (1) defendant's right to due process was violated when the State presented the false testimony of Bean and the testimony contributed to her conviction; (2) defendant's rights to due process and fundamental fairness were violated because, at the time of her guilty plea to concealment, defendant was not advised of the consecutive nature of her sentences; and (3) defendant was denied the effective assistance of counsel when trial counsel failed to investigate or call her neighbor, Ana L. Glanaras, to testify in support of defendant's claim of self-defense. As to the last claim, defendant argued she informed trial counsel of a witness, her neighbor Glanaras, who saw defendant "just after the alleged incident when the bruising would have been more pronounced." Defendant asserted trial counsel failed to investigate or call Glanaras regarding this bruising. In support of this new claim, defendant attached an affidavit she signed. The second amended postconviction petition included Findley's affidavit.

¶ 34 In May 2019, the State moved to dismiss defendant's postconviction petition. The State argued, in part, defendant failed to allege facts showing the State knew Bean's testimony was false and defendant's ineffective-assistance-of-counsel claim failed as it was contradicted by the record and defendant failed to attach an affidavit from Glanaras.

¶ 35 In a written filing in response to the motion, defendant argued all well-pleaded allegations and the affidavit testimony must be taken as true. Defendant further argued, "[t]he mere fact that Tonya Bean made these statements to Findley is impeachable evidence which could have been used by trial counsel to undermine the credibility of Tonya Bean's testimony" during trial. As to the claim regarding Glanaras, defendant cited *People v. Dupree*, 2018 IL 122307, ¶ 34, 124 N.E.3d 908, as showing there is no bright-line rule requiring an affidavit in all

- 12 -

instances where this type of claim is raised.

¶ 36        A hearing was held on the State's motion to dismiss. At the hearing, defense counsel Rinker stated the following:

> "Your Honor, I think that the—looking first to the issue—I guess I'm calling issue one, about the affidavit or lack thereof from the various Tonyas in the case. I will admit it gets confusing. We have an affidavit from one entity or one party here who says, Hey, somebody else told me they actually lied when they testified during the course of their trial. I guess what we're arguing to the Court is that whether or not that actually is true, that they did lie when they testified during the course of the trial, it is impeachable evidence that the defense attorney during the course of the trial could have used to impeach the credibility of that witness through cross-examination. And I think that that is a distinction that's important here because if we are going to take at this stage of the proceedings Tonya Findley's affidavit as true, then it is impeachable evidence on Tonya Bean's truth and veracity, whether or not Tonya Bean was being truthful when she said that."

The circuit court specifically asked defense counsel about the State's argument there was nothing in the affidavit to establish the State had knowledge of Bean's alleged perjury. To that, defense counsel responded:

> "The [timeline] here would suggest that this affidavit came out after trial counsel could have even known that this affidavit

- 13 -

existed. So how can she raise an ineffective assistance of counsel claim against the trial attorney for not having brought this witness forward when he didn't know that the witness existed. So we uncovered the existence of this affidavit after that consideration would have come about. I think we can all agree that if it's taken as truth, it's certainly impeachable evidence. It would have been something that could have been used by trial counsel during the course of cross-examination to impeach the credibility of that witness and that that would have been important evidence for my client or for her benefit.

    \*\*\*

And I'm circling back to the answer to the Court's question which is, our position here today I think must be that to require my client at this stage to prove that the State knew that that was false testimony is not what we are asking the Court to do. We don't think the Court has to do that. It would be our position that the existence of this affidavit alone taken as truth, knowing that it would have been impeachable evidence is sufficient. That would be our position."

¶ 37    As to the issue regarding Ana Glanaras's purported testimony, defense counsel argued there was a significant time gap between the alleged incident and when defendant was taken into custody. Defense counsel argued Glanaras's testimony would describe defendant's injuries before healing would have occurred. Defense counsel argued if Glanaras could establish

- 14 -

the injuries were more pronounced or egregious, that would have corroborated defendant's claim of self-defense. When asked if this would be waived, defense counsel said the record does not show Ana Glanaras was a potential witness.

¶ 38 The circuit court granted the State's motion. The court emphasized there were no allegations in the postconviction petitions the State knowingly used false or perjured testimony and thus there were no facts to establish defendant's due process rights were violated. As to her ineffectiveness claim, the circuit court found it "refuted by the record." The court found the following:

> "There is no affidavit as to what Ana Glanaras would testify to only allegations by the Petitioner which, for the purposes of this motion, the court takes as true. However, the record shows [defendant] was able and did present evidence of self-defense at trial. The trial judge specifically noted this in 2013 at a *Krankel* hearing. At best, Glanaras['s] testimony would be cumulative to what was already presented. The Court does not find Defendant's right to effective assistance of counsel was violated for failing to present cumulative evidence."

¶ 39 This appeal followed.

¶ 40        II. ANALYSIS

¶ 41        A. Due Process

¶ 42 Defendant first argues the circuit court erred in granting the State's motion to dismiss as she made a substantial showing the State knowingly presented the perjured testimony of Bean.

- 15 -

¶ 43	The Act sets forth procedures by which a criminal defendant may assert, in the proceedings that led to his or her conviction, there was a substantial denial of his or her constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2014). A proceeding under the Act is a collateral attack on the conviction that provides limited review of constitutional claims not raised at trial. *People v. Greer*, 212 Ill. 2d 192, 203, 817 N.E.2d 511, 518 (2004). When a defendant files a petition under the Act, a circuit court reviews that petition and determines whether it is frivolous or patently without merit. *Id.* at 203-04. Petitions that survive this review advance to the second stage of proceedings where counsel is appointed, and an amended petition may be filed. *People v. Andrews*, 403 Ill. App. 3d 654, 659, 936 N.E.2d 648, 653 (2010). In response, the State may answer the petition or move to dismiss it. 725 ILCS 5/122-5 (West 2014).  To survive a motion to dismiss and advance to a third-stage evidentiary hearing, the defendant must make a substantial showing a constitutional violation occurred. *People v. Pendleton*, 223 Ill. 2d 458, 473, 861 N.E.2d 999, 1008 (2006). "To accomplish this, the allegations in the petition must be supported by the record in the case or by its accompanying affidavits." *People v. Coleman*, 183 Ill. 2d 366, 381, 701 N.E.2d 1063, 1072 (1998). In ruling on the motion, the circuit court must take all well-pleaded factual allegations not positively rebutted by the record as true. *Id.* at 380-81. We review *de novo* the question of whether the postconviction petition makes a substantial showing of a constitutional violation. *People v. Johnson*, 205 Ill. 2d 381, 389, 793 N.E.2d 591, 597 (2002).

¶ 44	The State's knowing use of perjured testimony to obtain a criminal conviction violates a defendant's constitutional right to due process. *People v. Simpson*, 204 Ill. 2d 536, 552, 792 N.E.2d 265, 278 (2001). "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could

have affected the jury's verdict." *People v. Olinger*, 176 Ill. 2d 326, 345, 680 N.E.2d 321, 331 (1997). To establish a constitutional violation cognizable under the Act, there must be "an allegation of knowing use of false testimony." *People v. Brown*, 169 Ill. 2d 94, 106, 660 N.E.2d 964, 970 (1995). Without an allegation of the knowing use of false testimony or lack of diligence on the State's part, a defendant has not shown involvement by the State to establish a violation of due process. *Id.*

¶ 45        In support of her claim she made a substantial showing the State "knowingly" used perjured testimony, defendant highlights the following language in Findley's affidavit: "Tonya Bean stated to me that most of her testimony was information the states attorney [*sic*] told her to say."

¶ 46        We find defendant has not made a substantial showing the State knowingly used perjured testimony. The highlighted, vague statement does not show the information provided by the State was information that was false or the State knew to be false. According to the evidence at trial, Bean recorded the conversation in writing an hour after it occurred and that documentation was provided to the State. Without factual allegations regarding the content of the information provided by the State, defendant has failed to make a substantial showing the State provided information it knew to be false.

¶ 47        In the alternative, defendant argues the taken-as-true allegations in her postconviction petition and supporting documentation, considered with the facts of the case, "strongly suggest implicit knowledge on the part of the State." Defendant points to the statements that if Bean received knowledge from the news and her family and friends, the State should have realized she had no more information than did the general public. Defendant contends if Bean gathered information from conversations with the prosecutors, the State should

have realized her testimony changed. Defendant maintains the fact Bean benefitted from speaking to the police and the prosecution further suggests the prosecution had knowledge Bean's testimony was false. Defendant also emphasizes that during Bean's testimony, Bean misstated the name of Imperial Buffet as "Imperial Garden," which merged the names of the two restaurants connected to Wang (Imperial Buffet and Lucky Garden). Defendant concludes that such a misstatement occurred randomly seemed implausible "*unless* the reason she confused them was because the prosecution provided her with information involving or documents containing both names."

¶ 48      We are not convinced "strongly suggest" is sufficient to satisfy the substantial-showing-of-a-constitutional-violation threshold of second-stage review. Nor are we convinced by defendant's long list of what-if scenarios. Without factual allegations, this string of speculative statements is insufficient to establish implicit knowledge. The substantial-showing threshold requires more, and defendant's postconviction filings fail to meet that threshold.

¶ 49                    B. Reasonable Assistance of Counsel

¶ 50      Defendant next argues she was denied the reasonable assistance of counsel as counsel, despite filing a certificate averring compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), failed to properly present and support her perjury claim and failed to attach an affidavit from the named witness in her ineffective-assistance-of-counsel claim.

¶ 51      Under the Act, appointed counsel is expected to provide reasonable assistance. *People v. Suarez*, 224 Ill. 2d 37, 42, 862 N.E.2d 977, 979-80 (2007). Rule 651(c) is designed to ensure such reasonable assistance is provided to postconviction petitioners. *People v. Turner*, 187 Ill. 2d 406, 411, 719 N.E.2d 725, 728 (1999). That rule "requires appointed counsel to consult with the petitioner to ascertain his contentions, examine the record of the trial

- 18 -

proceedings, and make any amendments to the *pro se* petition necessary for an adequate presentation of the petitioner's complaints." *People v. Nelson*, 2016 IL App (4th) 140168, ¶ 15, 49 N.E.3d 1007. The mandate counsel make necessary amendments is not limitless, however. *Id.* ¶ 16. For example, there is no obligation for counsel to search for sources outside the record that may support general claims in a postconviction petition. *Id.* In addition, amendments to a *pro se* petition that would simply further a claim that is frivolous or patently without merit are not "necessary." *Greer*, 212 Ill. 2d at 205. Appointed counsel is, however, prohibited by ethical obligations from advancing frivolous or spurious claims. *Id.*

¶ 52         In addition, appointed counsel must file a certificate stating he or she complied with Rule 651(c). Ill. S. Ct. Rule 651(c) (eff. July 1, 2017). This certificate creates a presumption the defendant received reasonable assistance. See *People v. Jones*, 2011 IL App (1st) 092529, ¶ 23, 955 N.E.2d 1200. A defendant may overcome that presumption by showing counsel failed to comply substantially with the requirements of Rule 651(c). *Id.* The failure to comply with Rule 651(c) cannot be remedied or excused by a finding the postconviction petition did not contain a meritorious issue. *Suarez*, 224 Ill. 2d at 51-52. The analysis under Rule 651(c) is "driven, not by whether a particular defendant's claim is potentially meritorious, but by the conviction that where postconviction counsel does not adequately complete the duties mandated by the rule, the limited right to counsel conferred by the Act cannot be fully realized." *Id.* at 51. Noncompliance with the rule will not be excused as harmless error. *Id.*

¶ 53         In this case, defendant acknowledges appointed counsel filed a Rule 651(c) certificate but argues the record rebuts the presumption reasonable assistance was afforded. Defendant argues the record establishes appointed counsel acted unreasonably when he failed to present her perjury claim properly and when he failed to include evidentiary support for

defendant's ineffective-assistance claim.

¶ 54        The record establishes appointed counsel, in the second amended petition, added the ineffective-assistance-of-counsel claim based on trial counsel's failure to present testimony from Ana Glanaras, defendant's neighbor, regarding defendant's injuries as they appeared "just after the alleged incident when the bruising would have been more pronounced." This claim did not appear in either the *pro se* or the amended postconviction petitions. Appointed counsel did not, however, include an affidavit by Glanaras.

¶ 55        The State argues no error occurred as appointed counsel is under no obligation to add claims or affidavits to support nonmeritorious claims. The State further cites *People v. Johnson*, 154 Ill. 2d 227, 241, 609 N.E.2d 304, 311 (1993), as showing a circuit court may reasonably presume postconviction counsel made a concerted effort to obtain affidavits in support of the postconviction claims but was unable to do so. In addition, the State argues this was clearly a nonmeritorious claim as defendant did not mention Glanaras when the trial court conducted a *Krankel* inquiry after her trial and, therefore, forfeited this claim.

¶ 56        The State's argument is misplaced. While appointed counsel is not obligated to add claims or affidavits to support a *pro se* petition's nonmeritorious claims, appointed counsel *added* this claim. If counsel was aware of his ethical obligations not to file futile or spurious claims, appointed counsel determined this claim had merit, as he signed the second amended petition, but then failed to provide the evidentiary support necessary to support this claim.

¶ 57        The record reveals appointed counsel's failure to provide evidentiary support to a claim he added may have resulted from the belief such an affidavit was unnecessary. At the hearing on the State's motion to dismiss defendant's second amended petition, appointed counsel argued he need not attach an affidavit based on the *Dupree* court's refusal to adopt a bright-line

rule requiring an affidavit in all instances where an ineffectiveness claim is raised based on trial counsel's failure to call a witness. *Dupree*, 2018 IL 122307, ¶ 34. Yet *Dupree* plainly establishes "[i]n cases where a postconviction petitioner raises a claim of ineffective assistance based on counsel's failure to call a witness, an affidavit from the proposed witness will be required if it is essential for the postconviction petition to make the necessary 'substantial showing' to support a claim of ineffective assistance." *Id.* The *Dupree* court acknowledged, "It may be true that in most cases where this type of claim is raised, without an affidavit, there can be no way to assess whether the proposed witness could have provided evidence that would have been helpful to the defense." *Id.*

¶ 58        Here, without an affidavit, the circuit court could not ascertain whether a substantial showing of a constitutional violation could be made. Appointed counsel, by not attaching an affidavit from the witness, did not comply with Rule 651(c)'s mandate appointed counsel provide "necessary" supporting documentation when counsel added a claim but failed to support it with evidence. This case must be remanded for compliance with Rule 651(c).

¶ 59        We further find troubling, appointed counsel's handing of defendant's due process claim. In her *pro se* petition, defendant explicitly alleged she was denied due process when the State knowingly presented Bean's perjured testimony at trial. Such a claim requires proof the State had knowledge of the falsity of that testimony when elicited at trial. See *Brown*, 169 Ill. 2d at 106. Appointed counsel, who is discharged by Rule 651(c) to make "any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions," presented the same due process claim in the second amended petition but removed the allegation of "knowing" from defendant's *pro se* petition. Then, in responding to the State's motion to dismiss, appointed counsel abandoned the original due process claim to

argue defendant need not prove the State's malfeasance but somehow should "be allowed the opportunity to cross-examine that witness at a new trial to impeach the credibility of that witness." Although appointed counsel elected to proceed on a claim defendant was denied "due process," counsel proceeded as though the State's conduct was irrelevant to that claim despite the fact a violation of due process does not occur absent an involvement by the State. See *Brown*, 169 Ill. 2d at 106 ("In the absence of an allegation of the knowing use of false testimony, or at least some lack of diligence on the part of the State, there has been no involvement by the State in the false testimony to establish a violation of due process.").

¶ 60        The State argues the decision to remove "knowing" from the original allegations was based on the following: "[c]learly, post-conviction counsel had nothing to support a claim that the State knowingly presented perjured testimony at trial, so [he] did not make that allegation and took 'knowingly' out of the allegation that had been in the *pro se* petition." If that is the case, then appointed counsel knowingly filed a futile due process claim as counsel did not even attempt in the drafting of the second amended petition to satisfy the elements of defendant's claim. Either appointed counsel failed to make necessary amendments to preserve defendant's *pro se* claim or counsel violated his ethical obligations by filing a baseless claim after determining defendant's claim was meritless. See generally *Greer*, 212 Ill. 2d at 205 ("An attorney *** who determines that defendant's claims are meritless cannot in good faith file an amended petition on behalf of defendant.").

¶ 61        While the circuit court commendably considered the allegations in all three of the postconviction petitions filed in this case, despite not needing to do so, we cannot excuse the absence of reasonable representation for defendant. As this court observed in *People v. Shortridge*, 2012 IL App (4th) 100663, ¶ 15, 964 N.E.2d 679, "[o]ur decision here should not be

- 22 -

construed as any indication of whether the allegations set forth in defendant's petition have merit." Our finding "rests solely on the conduct of postconviction counsel during these proceedings." *Id.* We reverse the order dismissing defendant's second amended petition and conclude new counsel should be appointed to represent defendant on remand. See *id.* An amended petition may be filed, and second-stage proceedings should occur.

¶ 62                                    III. CONCLUSION

¶ 63            We reverse the circuit court's judgment and remand for second-stage proceedings.

¶ 64            Reversed and remanded.