NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 230770-U

NO. 4-23-0770

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 28, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| MISOOK NOWLIN, | ) | No. 11CF800 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott Kording, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Steigmann and Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held*:   As defendant failed to prove she could not meaningfully communicate with the court or counsel, she did not prove she was denied due process or the assistance of counsel in the second and third stages of postconviction proceedings when she was not provided an interpreter.

¶ 2   In January 2023, the trial court denied the postconviction petition of defendant, Misook Nowlin, after holding a third-stage evidentiary hearing under section 122-6 of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-6 (West 2022)). Defendant appeals, arguing various claims based on her alleged inability to understand English: (1) she was denied due process at the hearing, (2) she was constructively denied her statutory right to postconviction counsel during the second and third stages of proceedings, and (3) counsel provided unreasonable assistance by not requesting an interpreter. We affirm.

¶ 3                                I. BACKGROUND

¶ 4          In September 2011, defendant was charged with three counts of the first degree murder of her mother-in-law (720 ILCS 5/9-1(a)(1), (a)(2) (West 2010)) and one count of concealment of a homicidal death (720 ILCS 5/9-3.4(a) (West 2010)). On the first day of trial in December 2012, defendant pleaded guilty to the concealment charge. The jury trial proceeded on the first degree murder charges.

¶ 5                                     A. Trial

¶ 6          At trial, defendant testified without the aid of an interpreter. We need not provide a thorough summary of the trial proceedings as, for the most part, those proceedings are irrelevant to this appeal. It is worth noting, however, defendant provided lengthy testimony in support of her claim her mother-in-law's death was the result of self-defense. The transcript from defendant's trial contains approximately 70 pages of her testimony. The jury found defendant guilty of first degree murder. She was sentenced to consecutive prison terms of 50 years for murder and 5 years for concealment.

¶ 7          In January 2013, defendant sent two letters to the trial court asserting, in part, she was denied the effective assistance of trial counsel when counsel denied her request to seek an interpreter. The following month, the court held a hearing on those allegations pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). At that hearing, defendant testified her daughter told her, "[Y]ou can speak English but you have an accent[ ] and some people don't understand." Because of this, on the first day of trial, defendant asked one of her trial attorneys, Carla Barnes, for a translator, but Barnes denied her request. When the court asked Barnes and defendant's other trial attorney, Brian McEldowney, whether defendant made such a request, both replied she did not.

¶ 8    At the close of the hearing, the trial court found defendant's claim baseless, concluding the record demonstrated defendant did not need an interpreter. The court found counsel's statements credible and determined the following:

> "Never once during this case while it was pending did you ever indicate to the Court that you needed an interpreter, that is clear. Throughout the case the Court has had the opportunity to observe you in court, observe you while you testified in court on a number of different occasions at different hearings including the trial. The Court was able to view your videotaped interview with the police in which you had a conversation wholly in English. The Court did not note anything in any of those observations that suggested that you needed an interpreter. The Court had been informed through evidence at hearings in the case that you had been in this country for a long time, you had operated a business here, you had worked as an interpreter translating Korean into English and English into Korean for a period of time. And in addition to all of that, the Court also went back, frankly I went back and I reviewed all of your prior court files in which you had appeared in County Court in two felony and several misdemeanor trials. I reviewed the records in all of those cases and noted that never once was an interpreter requested or used in any of those cases, including a trial that was held in at least one of those cases, a bench trial."

¶ 9                                    B. Direct Appeal

¶ 10         After the *Krankel* hearing, defendant filed a direct appeal. On appeal, defendant

argued (1) her murder conviction should be reversed, as the trial court allowed a detective who

would testify against defendant to sit at the prosecution's table during trial, and (2) regarding her

concealment conviction, this court should remand for strict compliance with Illinois Supreme

Court Rule 604(d) (eff. Feb. 6, 2013)). *People v. Nowlin*, 2015 IL App (4th) 130387-U, ¶ 3. We

affirmed defendant's murder conviction. *Id.* As to the concealment conviction, we vacated the

order denying defendant's motion to reconsider sentence and remanded for the filing of a Rule

604(d) certificate, the opportunity to file a motion to withdraw the guilty plea or a motion to

reconsider sentence, and a new hearing. *Id.*

¶ 11         On remand, defendant filed a motion to reconsider her sentence. In September

2015, a hearing on the motion to reconsider sentence was held, and the motion was denied. She

appealed, arguing the trial court failed to admonish her the sentence for concealment would run

consecutively to her sentence for murder. *People v. Nowlin*, 2017 IL App (4th) 150957-U, ¶ 2.

Because defendant did not file a motion to withdraw her guilty plea, we lacked jurisdiction to

consider her claim. *Id.* ¶ 15.

¶ 12                            C. Postconviction Proceedings

¶ 13         In September 2015, defendant filed a *pro se* postconviction petition, asserting

many claims, including an allegation she was denied due process when the trial court denied her

request for an interpreter. The postconviction proceedings were lengthy. They involved three

amended complaints. Assistant Public Defender Jeff Brown filed the first amended petition. In

that petition, counsel asserted two claims, but he did not include the claim defendant was denied

due process when she was denied an interpreter. After the public defender's office withdrew as

- 4 -

counsel due to a conflict of interest, new counsel, Joshua Rinker, was appointed to represent defendant. In the second amended postconviction petition, Rinker added a claim but did not reassert defendant's claim she should have been provided an interpreter. See *People v. Nowlin*, 2021 IL App (4th) 190851-U, ¶¶ 30-31, 33. After the dismissal of the second amended postconviction petition, this court remanded the matter for the appointment of new counsel and new second-stage proceedings after we determined defendant was denied the reasonable assistance of counsel during the second stage of proceedings (see *id.* ¶¶ 38, 61).

¶ 14        On remand, Brown again represented defendant and did so through the evidentiary hearing at issue in this appeal. Notably, at an August 1, 2022, status hearing, Brown informed the trial court he was still working on the third amended petition and stated the following:

> "I appreciate the Court having my client come here today. It gives me a chance to try and communicate with her. We've got a little bit of a language barrier here, but I think I am at the point now where I can at least work on drafting an amended petition."

¶ 15        In December 2022, defendant filed her third amended postconviction petition, asserting McEldowney, her trial counsel, promised her if she pleaded guilty to concealment of a homicidal death, she would receive a 2-year sentence for that charge and a 20-year sentence for second degree murder. According to defendant, despite this promise, when she was sentenced to consecutive terms of 5 years for concealment and 50 years for first degree murder, counsel did not file a motion to withdraw her guilty plea. Defendant averred, had she known she would not receive the two-year sentence or that the sentence would be served consecutively to a murder sentence, she would have gone to trial and asserted a claim of self-defense on all counts.

¶ 16        The State did not move to dismiss the third amended petition but filed an answer to defendant's petition, asserting defendant could not make a substantial showing counsel provided ineffective assistance. The State pointed to the transcript, which showed defendant told the trial court she was not promised anything in connection with her plea.

¶ 17        The evidentiary hearing on the third amended postconviction petition was held in May 2023. At the hearing, two witnesses testified: defendant and McEldowney.

¶ 18        Defendant began by testifying Korean is her first language. Third-stage counsel asked, "[I]f I or [the State] ask[s] you any questions that you are confused by, will you, rather than guessing at the answer, let us know that you are confused and allow us to maybe rephrase it so that you can understand it?" Defendant responded, "Yes."

¶ 19        Defendant agreed she pleaded guilty to concealment of a homicidal death. She further agreed she talked with McEldowney before her plea. The following questions and answers occurred:

"[THIRD-STAGE COUNSEL:] Did you discuss with him what you would get if you pled guilty to that offense?

A. No.

Q. You didn't discuss at all what you would get?

A. No.

Q. Did you have any idea what you would get if you pled guilty to that offense?

A. No. He—I think he told me maybe I can get two years for the death hided body thing.

Q. I am going to ask you to repeat that because I am having

- 6 -

a little bit of difficulty understanding what I am guessing other people are, too.

A. Okay.

Q. What was your understanding of what the repercussions would be if you pled guilty to Concealment of a Homicidal Death?

A. Yeah.

Q. What did you—

THE COURT: Let me help. [Defendant], here is what I heard you say, and you correct me if I am wrong.

A. Okay.

THE COURT: I heard you say that you think maybe your attorney said you could get two years for the hiding the body thing?

A. Yes.

THE COURT: Is that what you just said a moment ago?

A. Yes."

¶ 20    Defendant agreed the possibility of the two-year sentence led her to plead guilty to that charge. She did not understand the sentence for concealment would be served consecutively to her sentence for first degree murder. Brown asked if she felt McEldowney "made any promises as to what [she] would receive if [she] pled guilty to Concealment of a Homicidal Death." Defendant responded, "He did not tell me how many years I was going to get." Counsel repeated defendant's response in the form of the question, and defendant verified her counsel did not tell her how many years she was "going to get." The trial court stated, "[F]or

the record, I agree that Mr. Brown's repeating of the question is consistent with what the defendant sounded like she was saying."

¶ 21        Brown further asked, "If you understood those sentences would have been served—had to be served separately, would you have pled guilty to the concealment charge?" Defendant stated, "No." When asked if she would have gone to trial on that charge, defendant responded, "Yes." Brown then asked if, in July 2015, when she was in court for a status date and the trial court explained her options for filing a motion to reconsider the sentence or a motion to vacate the guilty plea, she had time to talk to McEldowney regarding her sentence. Defendant replied, "Yes." Defendant testified the two discussed her options. When asked if she understood the difference between a motion to reconsider the sentence and a motion to vacate the guilty plea, defendant replied, "No." When asked if her counsel informed her about filing a motion to vacate the guilty plea, defendant said, "No." A motion to reconsider the sentence was filed instead.

¶ 22        Defendant agreed she filed a lengthy *pro se* postconviction petition. Defendant stated she wrote the petition but then said, "Actually, my friend helped me out because my English is not that good." Defendant further testified, "I know something not right so I asked my friend to write for me post-conviction because something is not right. So she write for me with handwriting. But I just tell her something is not right, you know."

¶ 23        On cross-examination, defendant agreed she was asking the trial court for a new trial on the concealment charge. She further agreed she gave a statement to police officers telling them what she did with the victim's body and where it was buried. The following exchange then occurred:

"Q. What would your defense be to that count of

concealment if the Court grants you a new trial?

[BROWN]: I am going to object. She doesn't know defenses. She is not a lawyer.

A. Yeah. I—

THE COURT: Hold on a second, [defendant].

So, the specific evidentiary rule you are citing is?

[BROWN]: That requires legal terms. She is talking in legal terminology that my client—my client, frankly, barely speaks English. She is not going to be able to—she doesn't understand what affirmative defenses are."

¶ 24        After the trial court withdrew the question, the State asked defendant what evidence she would present at trial to show she is innocent of the offense. Defendant responded, "First of all, I'm asking for my lawyer. You know, I want to have my lawyer. I don't want to talk about anything." The court then asked, "[Defendant] I want to make sure I correctly understood the last answer you gave. Did you say you do not want to discuss what new evidence there would be, you would want to talk with your attorney?" Defendant responded, "Yes. I want my lawyer. I want to have my lawyer to talk about. I don't want to talk about anything."

¶ 25        McEldowney testified that, before the trial began, he advised defendant to plead guilty to concealment. McEldowney reasoned the evidence on that charge was substantial, emphasizing defendant told the police the location of the body. The strategy for trial was to take responsibility for the concealment of the death but pursue self-defense on the first degree murder charge. McEldowney believed the plea would increase defendant's credibility for the self-defense assertion. McEldowney did not make any promises regarding sentencing for

concealment. McEldowney filed a motion to reconsider sentence, which was denied.

¶ 26 According to McEldowney, he and defendant appeared before the trial court again on July 31, 2015. The court explained defendant had the option of proceeding with a motion to withdraw the guilty plea or a motion to reconsider sentence on the concealment charge. McEldowney stated defendant, at some point, expressed some confusion. The court then admonished her in greater detail. The court then gave defendant time to think about her decision. One month later, defendant appeared before the court, and McEldowney informed the court they were proceeding on a motion to reconsider. Defendant agreed with the decision. McEldowney did not want to pursue a motion to withdraw a guilty plea, as the evidence was so overwhelming and defendant's plea was voluntary. The only issue was the court's failure to admonish defendant regarding the consecutive nature of the sentences. There were no other grounds to withdraw her plea. McEldowney believed she would be convicted if they proceeded to a trial on the concealment charge.

¶ 27 Brown asked McEldowney if, when talking to defendant, he "had difficulty understanding what she was saying." McEldowney stated:

"I don't recall any real difficulty communicating with her, no. There are times—and it is highlighted in one of these transcripts where she expressed some confusion and said that she had some difficulty with the English language. But I didn't—I never had any problem communicating with her, and I didn't perceive any difficulty that she was having understanding what I was saying."

¶ 28 In August 2023, the trial court denied defendant's third amended postconviction

- 10 -

petition.

¶ 29        This appeal followed.

¶ 30                                II. ANALYSIS

¶ 31        On appeal, defendant contends she should have been provided an interpreter during postconviction proceedings and the fact she was not given one resulted in a denial of her due process rights and reasonable representation, if there was any representation at all. The State counters the record establishes defendant understood English, and, therefore, this court should affirm the denial of her third amended postconviction petition.

¶ 32        The Act provides a three-stage process by which criminal defendants may obtain a statutory remedy for claims of "substantial violations of their constitutional rights at trial." *People v. Robinson*, 2020 IL 123849, ¶ 42. Petitions for postconviction relief that were not dismissed at the first stage advance to the second stage, where counsel is appointed and may amend the petition. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). Also at this stage, the State may answer the petition or move to dismiss it. *Id.* Petitions that survive the second stage advance to a third-stage hearing, at which a defendant may present evidence in support of his or her petition. *Id.* at 472-73.

¶ 33        On appeal here, defendant argues she is entitled to a remand, as she was denied due process during the evidentiary hearing and reasonable assistance of counsel at both the second and third stages of postconviction proceedings. Due process must be afforded in postconviction evidentiary hearings. See *People v. Kitchen*, 189 Ill. 2d 424, 435(1999) ("[T]he protection of a defendant's right to procedural due process in post-conviction proceedings is of critical importance."); *People v. Taylor*, 357 Ill. App. 3d 642, 648 (2005). Due process requires an accused to be given "the opportunity to be heard at a meaningful time and in a meaningful

manner." (Internal quotation marks omitted.) *People v. Stoecker*, 2020 IL 124807, ¶ 17 (quoting *In re D.W.*, 214 Ill. 2d 289, 316 (2005)). As to defendant's claims regarding her postconviction counsel's representation, we note, at all stages of postconviction proceedings, a defendant is entitled to the reasonable assistance of counsel. *People v. Suarez*, 224 Ill. 2d 37, 42 (2007); see *People v. Long*, 2024 IL App (4th) 230211-U, ¶ 89 ("[W]hen [Illinois Supreme Court Rule] 651(c) [(eff. July 1, 2017)] compliance is not at issue or no longer at issue, a general reasonableness standard otherwise applies to postconviction proceedings."). The issues of whether a defendant was afforded due process and whether a postconviction petitioner was afforded reasonable assistance of counsel are reviewed *de novo*. *Stoecker*, 2020 IL 124807, ¶ 17 (due process); *People v. Cotto*, 2016 IL 119006, ¶¶ 22-24 (assistance of counsel). We further note defendant, as the appellant, bears the burden of proving error in the trial court. See *Insurance Benefit Group, Inc. v. Guarantee Trust Life Insurance Co.*, 2017 IL App (1st) 162808, ¶ 44.

¶ 34        Key to defendant's appellate claims is proof she did not understand English to the extent she could meaningfully participate in the third-stage hearing or communicate with counsel in the presentation of her claims. Unfortunately, the issue was not raised before the trial court during postconviction proceedings. We are thus tasked with reviewing the record to make a determination as to defendant's comprehension of English, without having any input from those who interacted with her in the postconviction proceedings.

¶ 35        To prove defendant could not understand English and thus meaningfully communicate with counsel or the trial court, appellate counsel emphasizes the following: First, the State's appellee brief focuses on defendant's ability to speak English at the December 2012 trial and during a proceeding in 2015, well before the postconviction proceedings at issue.

- 12 -

Defendant acknowledges she was an interpreter but emphasizes that role ended almost three decades before the third-stage hearing. Second, during defendant's testimony at the third-stage hearing, she stated she asked a friend to help her write her *pro se* postconviction petition because her "English is not that good." Third, Brown made two statements at the third-stage hearing indicating defendant needed an interpreter. When making an objection to a line of questioning at the third-stage hearing, counsel stated defendant "barely speaks English," and in closing argument, counsel stated, "[S]ometimes it can be a little hard for her to understand us and for us to understand her." Fourth, defendant mistakenly confused the words "can" and "will" in her allegations regarding the concealment plea. At the 2023 third-stage hearing, defendant stated, "I think he told me maybe I *can* get two years for the death hided body thing." (Emphasis added.) In contrast, in the 2015 and 2022 postconviction petitions, defendant alleged counsel told her she "*will*" receive the two-year sentence. Appellate counsel stated, "It's entirely possible that [defendant] mixed up these modal verbs during her testimony." Fifth, of the approximately 40 questions asked by postconviction counsel, only 2 required defendant to answer beyond providing her name or a "yes" or "no" answer: "What is your first language?" and "What was your understanding of what the repercussions would be if you pled guilty to Concealment of a Homicidal Death?" Tellingly, to the latter question, defendant responded, "Yeah." The State took a similar approach in questioning defendant. The one open-ended question the State asked was what the defense would be if she were granted a new trial. Defendant refused to answer, saying she did not "want to talk about anything" and would leave it to her lawyer, indicating she possibly, due to her language barrier, could not answer the question.

¶ 36    Having reviewed the record, we find defendant has not shown she did not understand postconviction proceedings or was unable to communicate with postconviction

counsel. Our analysis begins with defendant's trial, at which she gave lengthy testimony in English in her defense. At the January 2013 *Krankel* hearing, the trial court clearly and unequivocally concluded defendant understood English and the proceedings before it. The record further shows McEldowney stated he had no difficulty communicating with defendant before the July 2015 proceedings on the motion to reconsider the sentence on the concealment conviction.

¶ 37        After July 2015, the record is not as clear on the issue of whether defendant understood English. However, we note, after her conviction, defendant was imprisoned in the Illinois Department of Corrections. Nothing in the record shows defendant had been in solitary confinement or in a prison where English is not the primary language. In addition, after the filing of her *pro se* petition in 2015, defendant had two attorneys representing her. Neither expressed an inability to communicate with defendant. Tellingly, Brown initially represented defendant in 2017 and drafted the first amended postconviction petition. After Brown was appointed again to represent defendant and file the third amended petition in August 2022, he noted some difficulty communicating with defendant but did not state he was unable to communicate with her or inform the court defendant's ability to communicate had declined.

¶ 38        We acknowledge Brown reported during the evidentiary hearing defendant "barely speaks English." However, the fact defendant "barely speaks English" is not a statement defendant does not speak English, but it is a statement she does in fact speak English. Furthermore, the context of that statement shows Brown made the statement to counter the State's questioning regarding an affirmative defense and defendant's inability to understand *legal terms*:

> "[THE STATE]: What would your defense be to that count
>
> of concealment if the Court grants you a new trial?

- 14 -

[BROWN]: I am going to object. She doesn't know defenses. She is not a lawyer.

A. Yeah. I—

THE COURT: Hold on a second, [defendant].

So, the specific evidentiary rule you are citing is?

[BROWN]: That requires legal terms. She is talking in legal terminology that my client—my client, frankly, barely speaks English. She is not going to be able to—she doesn't understand what affirmative defenses are."

The statement is made only to show his client would not understand "legal terminology" in the way it was phrased. Similarly, Brown's statement, "[S]ometimes it can be a little hard for her to understand us and for us to understand her," shows defendant and Brown were, in fact, able to communicate.

¶ 39　　　　We are also not convinced the fact defendant changed her testimony from asserting trial counsel informed her she *will* get two years for concealment to asserting trial counsel informed her she *can* get two years shows she was unable to communicate without the aid of an interpreter. There are other equally, if not more, compelling reasons for this shift. One, defendant's memory may have changed. Two, defendant, frankly, may not have been truthful and had forgotten which version of the story should be told.

¶ 40　　　　Last, we are not convinced by the form of the questioning with "yes" and "no" responses demonstrates defendant could not speak English. We note the answers to the questions were not all "yes" or all "no," but defendant's responses varied. The line of questioning demonstrates counsel led his client, who spoke "broken English," to support her postconviction

- 15 -

claims and does not show defendant did not understand what she was communicating.

¶ 41    As defendant has not shown she did not understand English or was unable to communicate with her counsel, defendant cannot establish she was denied due process, she was denied representation by counsel, or counsel provided unreasonable assistance by not seeking an interpreter.

¶ 42                      III. CONCLUSION

¶ 43    We affirm the trial court's judgment.

¶ 44    Affirmed.